**MAPCO, INC., Appellant,**

**v.**

**J. N. HOLT et al., Appellees.**

**No. 8195.**

Court of Civil Appeals of Texas,
Amarillo.

Nov. 15, 1971.

Rehearing Denied Dec. 13, 1971.

Lemon, Close, Atkinson & Shearer, Otis C. Shearer, Perryton, Marion Fallwell, Tulsa, Okl., for appellant.

Linn, Helms & Countiss, Richard N. Countiss, Spearman, for appellees.

REYNOLDS, Justice.

This is a condemnation proceeding. The judgment of the trial court is reversed and the cause is remanded.

The condemnor, Mid-America Pipeline Company, now MAPCO, Inc., the appellant, initiated these proceedings to condemn a 50-foot wide easement across a half section of cultivated, irrigated land in Hutchinson County for an underground pipeline to transport anhydrous ammonia. After a hearing before special commissioners, appellant deposited in the registry of the county court double the amount awarded the condemnees by the special commissioners, and entered into possession of the condemned easement. Upon appeal of the special commissioners' award to the county court, the condemnees, appellees here, withdrew from the court's registry the amount awarded them, leaving as triable issues only the market value of the easement taken and the damage, if any, to the remainder of the land. From a judgment entered on a jury's verdict, appellant has perfected its appeal, assigning 19 points of error. These assignments may be grouped broadly into three areas: improper statements and arguments points; no evidence and against the greater weight of the evidence points; and improper admission and exclusion of evidence points.

The 50-foot easement extends a distance of 2,658 feet (161.10 rods) from the east line of the north one-half of Section 49, Block 5–T, T. & N. O. Ry. Survey in Hutchinson County, 617 feet below the northeast corner thereof, diagonally to the south line, 1713 feet west of the southeast corner. The only irrigation well is located in the southwest corner of the tract, and the land is watered by surface irrigation in a general south to north direction according to the slope of the land. Approximately 65 to 70 acres of the land are situated to the north, or below, the pipeline area, and some 35 acres are to the south, or above, the pipeline area.

While the tenant farmer testified to the farming problems, and to some $9,900.00 expenses and crop losses occasioned by the installation of the pipeline, only two witnesses—James H. Godfrey, presented by appellant, and J. L. Brock, presented by appellees—testified to the value of the land before and after the condemnation for the easement. Godfrey testified that the value of the easement taken was $513.00, and the damage to the remainder was $1,700.00, or a total of $2,213.00. Brock's testimony was that the value of the easement taken was $1,067.50, and the damage to the remainder was $15,847.50, or a total of $16,915.00. Brock testified that he arrived at his valuations by determining that the land, ex-

clusive of the easement area, was damaged $50.00 an acre because of the easement. Subsequently, on cross-examination, he testified that his mental process in reaching this conclusion was a determination that the some 70 acres of land below the pipeline had been reduced in market value by $217.00 an acre, because of the difficulty in getting irrigation water across the pipeline area to it, and, after condemnation for the pipeline, was worth only $183.00 an acre. He testified that the 70 acres still will produce, and that the rest of the land was worth what it was before the easement was taken. He volunteered that a dry land place would sell for from $200.00 to $250.00 an acre. The jury found the value of the easement to be $599.25, and the damages to the remainder to be $11,200.00, for a total verdict of $11,799.25. Judgment was entered on the jury verdict.

Prior to the trial of the case, appellant filed and presented to the trial judge a motion in limine in which appellant sought a ruling to exclude, among other matters, any reference, or testimony, relative to any attempt by appellant to purchase the easement, that appellant failed to make a bona fide attempt to negotiate settlement with appellees prior to condemnation, and that appellant had greater financial resources than appellees. This motion was granted in these respects. The motion also sought the exclusion of any reference to, or testimony about, condemnees' unwillingness to sell the condemnation rights involved, any specific items of damage not related to the market value, or the jurors placing themselves in the position of a condemnee and considering their own personal feelings, if and when their property is condemned. The motion was denied in these respects.

Thereafter, appellees' counsel, in the opening statement to the jury, said:

"Now, bear in mind that these people did not want to sell their land; it wasn't for sale. It was taken, and it was taken right out across, not in the middle, but diagonally across their farm land."

Appellant's objection to the statement that the landowners did not want to sell was overruled.

In the opening summation, appellees' counsel made the following arguments to the jury:

"So, I say to you that you have to start with this figure right here when you're figuring difference in market value. You've got to start with this $9,906.00, and if you think Mr. Holt was unreasonable up here some where, well, cut him where you think he was unreasonable, and figure that in in addition to the difference in market value, and that's what we say will be justice in this case."

In the final summation, appellees' counsel made the following arguments to the jury, such objections as were made being indicated:

"* * * You've got these figures here, and then you've got to figure the difference in market value that would be caused on that day, * * *.

"MR. LEMON: Your Honor, I want to object to the erroneous measure of market damage argument that counsel is making to the jury.

"THE COURT: Overrule the objection.

"So, all of that cost of preparation, and the loss of crops is going to affect the market value of this land as of that day.

"* * * I want you to keep this in mind, that every one of us is affected by your verdict, because the law lets them condemn; the law lets them take. That would include your house, if it was in the way of that line. Do you know what you would have to do? Just move out. If it weren't true, don't think that he wouldn't be popping up to object.

"MR. LEMON: Your Honor, I do want to object to this argument. Simply stated, it's prejudicial argument, and I do object to it.

"THE COURT: Overrule the objection.

"So, they can take your house, and if Mr. Holt's house had been out there where their line went through, they could have taken his house.

"MR. LEMON: May we have a continuing objection to this line of argument?

"THE COURT: Yes, sir.

"Well, let me demonstrate it another way that might make it more clear to you. We talked about a prospective buyer, and they are a farm family, and they are wanting to buy this piece of land, and maybe they are wanting to build a house on it. Well, they can't build a house any place around that pipeline. A man couldn't get a farm woman to live close to an anhydrous ammonia line under 1200 pounds of pressure because farm women know too much about it, and not only that, they can't build anything on top of this line under the terms of this petition. You can see that a farmer can't construct anything on top of it. But let's put it in a town folk's way, how it would be for you town people. Say you had a house—what would you take for your livingroom? Well, let's don't go that bad, say one of the back rooms of your house. You're trying to sell your house and you've got a buyer in there, and you say, 'Listen, this is a lovely house and we'd like to sell it to you, but there's one thing we would like to tell you. This back room here on the side has been condemned. Now, you won't have any trouble with these people who condemned it. You won't have any trouble at all, but they've got a right to come in that room any time they want to, and they're messy, messy people, and I have to tell you—

"MR. LEMON: Objection, Your Honor, going outside the record and it's prejudicial.

"THE COURT: Overrule the objection.

" 'So, these people are messy when they come in there, and they can come in night or day, from now on until the end of time. But they really don't bother your use of the room, except when they come in there, and they are messy. Here's what you can do, though, you've got the right to sue them. You can go hire yourself an expensive lawyer'—and Mr. Fallwell says he's not an expensive lawyer, well, I can tell you that I am. I may not be worth it, but I'm expensive —'so you've got the right to hire an expensive lawyer and sue them and get that room cleaned up. But otherwise it won't hurt the rest of your house, just don't worry about it.' * * *

"So, these people are a profit making company, and I have no argument with that, none whatsoever. They're running ammonia through this line for a profit —that's great. That's the American system and I'm for it. But it's the American system that when something is taken from you by law, and you didn't want to sell it, that you be paid for it, and that you be paid fairly and adequately for it, and that's what we are asking them to do.

"They put on this humble act that they are trying to get along, if they are, what are we doing here in the courthouse? Ask them that question. They came on this land as trespassers. * * * Where is the guy who was in charge of all this stuff that's supposed to be settling this? They haven't told you where he was yet, have they? That's an old company act. A lot of company men know that. We don't know why he's not here. We don't know why he hasn't settled the damages for these people. I suggest to you that their conduct in this is a little less than what it should be to these people. There's no doubt that they are damaged, and I think you'll give them damages, and I think you'll give them adequate

damages, because what you do is going to affect every single one of us. When you consider the burden and the hazard that he has as a person, think that it might be your house or your property. Think of yourself having to go hire a lawyer and having to go to all of the expense of having an appraiser, or do all of the things they have had to do in addition to trying to do all this corrective work on this land. Think of them coming in there as bare trespassers and you having to tell them to get off your property, and then of them saying, 'Well, we'll help you water-pack this if you'll give us the water free.' Why, it's just like a man intruding into your home and messing up your carpet and saying he ought to get a free meal out of the deal. Their conduct hasn't been right. All I want is for my people to be paid for their damages. When you think about the damages, think about it from a standpoint of all of us, because it could be you, or it could be me, or it could be somebody else. What they've got involved is their corporate profits. What we've got involved is our constitutional rights, and your rights in property that are very sacred to all of you, as well as these people.

" * * * I firmly believe in what I have told you here today, and I think it's important what you decide, for all of us."

The statements and arguments complained of on this appeal were advanced in appellant's motion for new trial. After considering the statements and arguments in their proper setting in the entire record, we find them to be improper and prejudicial. By them it was emphasized that appellees were unwilling to sell the condemnation rights sought, that the jurors should consider their verdict by placing themselves in appellees' position, that damages should be considered from the viewpoint that the condemnation could be happening to the jurors, that appellees were entitled to damages because appellant did not make

a bona fide attempt to settle the damages, and that the jury should arrive at its verdict by adding to the difference in market value the total of the additional expenses and crop losses testified to because of the pipeline. None of these matters were either properly supported by competent evidence or properly before the jury. All of them were attempted to be excluded by the motion in limine and some of them were objected to at the time the statements and arguments were made.

When appellees withdrew the amount of the special commissioners' award to them, they assented to the taking of the easement and will not be heard to claim that the condemnor had no right to take their property, State v. Jackson, 388 S.W.2d 924 (Tex.Sup.1965), leaving as the only litigious issues before the jury the market value of the easement taken and the damages, if any, to the remainder of the tract. These being the issues, the trial judge should have sustained the motion in limine and the objections so as to exclude the improper statements and arguments relative to appellees' unwillingness to sell, to the erroneous measure of market value, and to the plea that the jury should consider the verdict by placing themselves in appellees' position. The cumulative effect of these statements and arguments, made over objection and introducing before the jury purported evidence not properly in the record and appealing to passion and prejudice, is that they were calculated to, and probably did, cause the rendition of an improper verdict and the judgment entered thereon. Southern Pacific Co. v. Hubbard, 156 Tex. 525, 297 S.W.2d 120 (1956).

Appellees contend that even assuming the statements and arguments were improper, appellant has not demonstrated harmful error. They argue that some of the argument made was not timely objected to and thereby waived, and in any event the jury verdict was well within the range of the evidence. Although it is not an inflexible rule, the general rule is that, to entitle

one to a new trial because of improper argument, objection must be made and overruled at the very time the improper argument is made, Texas Employers Ins. Assn. v. Haywood, 153 Tex. 242, 266 S.W.2d 856 (1954), but what appellees overlook is that these anticipated improper matters were brought to the attention of appellees and the trial court by appellant's motion in limine and by the objections made during the course of the trial. It may well be that had the trial court properly granted appellant's motion in limine, or at least sustained the initial objections, the improper statements and arguments would have been forestalled and rendered harmless; but the fact is that under the license of the court's rulings, the improper statements and arguments were in fact made. Reversible error occurs when the matters properly attempted to be excluded are in fact prejudicially injected over timely objection. Hartford Accident & Indemnity Co. v. McCardell, 369 S.W.2d 331 (Tex.Sup.1963). The refusal of the trial judge to sustain the motion in limine and the objections made to the statements and arguments sought to be excluded by the motion increased the harmful effect of the suggestions that the jury was at liberty to fix its verdict on erroneous measures of damages, and constitutes reversible error. Texas & N. O. Ry. Co. v. Sturgeon, 142 Tex. 222, 177 S.W.2d 264 (1944). The degree of the vice, allowed over objection, in view of the vigorously contested issue of diminution in market value of the remainder of the tract, is such that, from the record as a whole, prejudicial harm resulted.

In view of our remand, we shall not review appellant's no evidence and against the greater weight of the evidence assignments in detail, because the evidence and the predicate upon which it is based very well could be different upon another trial; however, we do make the following observations in connection with the matters complained of that may arise in the event of another trial.

■ We do not agree with appellant's contention that the valuation testimony of J. L. Brock should have been stricken. His qualification is a matter entrusted to the discretion of the trial court, City of Teague v. Stiles, 263 S.W.2d 623 (Tex. Civ.App.—Waco 1953, writ ref'd n. r. e.), and his qualification met the legal test set out in Rayburn, Texas Law of Condemnation, § 126. Appellant's complaints with respect to the testimony are more properly directed to the weight, rather than the admissibility, of such testimony. Neither do we perceive error in the trial court's admitting the testimony of the tenant farmer as to damages. Demonstrative evidence, such as the chart complained of here, may be used at all stages of the proceeding, Rayburn, Texas Law of Condemnation, § 165(1), and evidence of specific items of damage resulting from construction of the pipeline is admissible, not as the measure of damages, but as elements to enable the jury to arrive at the correct market value, so long as such items are related to and tend to affect the market value of the land. State v. Carpenter, 126 Tex. 604, 89 S.W. 2d 194 (1936). Additionally, we see no error, under the testimony in this record, in the trial court's refusal to permit Godfrey to testify to the comparison of sales of land in Hale County, a distance of some 150 miles from the land involved in this proceeding. Whether the Hale County property met the test of similarity is largely a matter within the discretion of the trial court and no abuse of discretion is shown in the record in this respect. Morgan v. State, 343 S.W.2d 738 (Tex.Civ. App.—El Paso 1961, writ ref'd n. r. e.); State v. Childress, 331 S.W.2d 230 (Tex. Civ.App.—Eastland 1959, writ ref'd n. r. e.).

Reversed and remanded.